### Rounds & Jesse v. The Cloverport Foundry & Machine Company.

(Decided June 5, 1914.)

### Appeal from Breckinridge Circuit Court.

1. Contracts—Maritime Contract Defined.—A maritime contract is one relating to a ship as an instrument of commerce or navigation when tending to facilitate its use as such, or in connection with its use as such.

2. Liens—Maritime Liens.—A maritime lien does not arise out of every maritime contract; in order for a maritime lien to arise, the service must in some way be brought into relation with the ship itself and tend to facilitate her use as an instrument of commerce.

3. Liens—State Cannot Annex Admiralty Lien to Contract for Original Construction of Vessel.—A State cannot annex an admiralty lien to a contract for the original construction of a vessel, as that is not, under the decisions, maritime by nature, and a State cannot change its nature; but as the power of the State in this regard is limited only by the admiralty clause of the federal constitution, it is free to annex liens to non-maritime causes of action, such liens being ordinary statutory liens and not maritime liens; and for this reason it can give a lien enforcible in its own courts on a contract for the building of a ship.

4. Pleading—Purpose of.—The purpose of all good pleading is to make plain the issues between the parties, and when that has been done and the case has been tried upon the merits, the courts will be slow to reverse the judgment upon a technical view of the pleadings.

5. Appeal—Pleading.—Where a cause of action was first set up in the reply when it should have been set up by amended petition, and the trial court and the parties treated the reply as an amendment to the petition, and acted upon it upon the trial and in the decree as such, it will be so treated upon appeal.

6. Judgment—When Judgment of Chancellor Will Not Be Disturbed.—Where the proof is contradictory and the mind is left in doubt, the judgment of the chancellor will not be disturbed.

SWEENEY, ELLIS & SWEENEY and FLOYD J. LASWELL for appellants.

CLAUDE MERCER for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This is an appeal by Rounds & Jesse, of Owensboro, from a judgment recovered against them in the Breckinridge Circuit Court for $5,668.65 by the Cloverport Foundry & Machine Company for the reconstruction of a tow-boat formerly known as the "R. D. Kendall," but subsequently rechristened the "Golden Girl." The judgment also dismissed appellants' counterclaim.

Representatives of the parties having reached a verbal agreement it was reduced to writing, in the shape of the following letter or proposition from the appellee to the appellants, and accepted by the latter:

"Cloverport, Ky., March 23, 1911.

"Messrs. Jesse & Rounds,
        "Owensboro, Ky.

"Gentlemen:

"On yesterday we mailed you blue prints giving specifications in detail for remodeling and rebuilding and converting the 'R. D. Kendall' into an excursion steamer along the lines suggested and agreed upon between us. To all intents and purposes, these cover the work to be done from the deck up, including the docking of the boat, recaulking, one new stack, and lengthening and changing old stack to conform with new one, turning boiler around, taking out engines and putting in the Parker engines and such machine work necessary to be done on same to put in first-class condition, building new wheel, mast poles, raising the bow, new cylinder timbers (any work other than turning around and resetting boiler which may show up to be extra), all necessary ropes for masts and in fact, everything necessary to be done to make the

job first-class in workmanship, at our estimate of sixteen hundred ninety and 66/100 dollars ($1,690.66).

"This price includes everything to be done as shown by the blue prints, including the docking and recaulking the hull as above stated, except any extra work we might find in the boiler and any new work we may have to put in the hull which we cannot see or make an estimate on, but all extra work to be done by us to complete the job and put same in good running condition and acceptable to the U. S. Steamboat Inspectors not to cost over two hundred dollars ($200.00); said extra work, if any found, and material used we agree to do and furnish at the actual cost therefor plus ten per cent.

"All lumber and timber used in the rebuilding to be of grade No. 1 common. Other material to be first-class and workmanship guaranteed.

"We have endeavored to make everything as clear to you as is possible to make on paper, having worked very diligently in getting up our plans and specifications, and while they are, practically speaking, complete, there is quite a number of little things not shown on them, which we thought entirely unnecessary to spend more time in enumerating them as our proposal carries with it all of these small items to complete the job. In short, we do the work for the sum named $1,690.66 and guarantee that such extra work as may have to be done that we cannot see or figure on shall not cost you exceeding the sum of two hundred dollars ($200.00).

"We are anxious to get the boat here and get to work on it and shall complete same at the very earliest possible date, which should not be longer than about June 1st to 10th, barring too much weather unfit for work.

"Will be glad to answer any further inquiries you may wish to make about the work to be done which we now believe all parties understand fully in a general way.

"Thanking you for past favors, we are

"Very truly yours,

"Cloverport Foundry & Machine Co.,

"By Marion Weatherholt."

Under this contract the boat was taken to Cloverport about April 1st and docked, preparatory to beginning the work.

While the boat was on the dock, and before any work had been done, it was examined by a United States Steam-

boat Inspector, who expressed the opinion that while the proposed repairs would be sufficient for the boat to pass the government inspection, they would make the boat seaworthy only for a short time, and that further repairs would be necessary within one or two years thereafter.

This information having been communicated to appellant Rounds, he went to Cloverport in May, 1911, and after examining the boat, Pate, appellee's foreman, says it was agreed between them that repairs additional to those contemplated in the contract of March 23, 1911, should be made and that it would be necessary to rebuild the boat from the bottom up, to make a good job of it. According to Pate, he and Rounds examined the boat together and agreed that a new hull was necessary; that Rounds asked Pate what this new work would cost, and Pate replied that while he was unable to say definitely, it looked like it would cost about $3,500.00, and the best way he could handle the job would be to keep an accurate account of the labor and material and then add a reasonable per cent for appellee's trouble. Pate says Rounds agreed to the proposition and directed Pate to rush the job as fast as he could. Pate describes the difference between the work contemplated under the contract of March 23rd, 1911, and as it was finally done under the verbal contract of May, by saying it was changed from a patch-job to a new job, and that the appellee did all the work called for under either contract.

Pate further testifies that later, during the last week of August, 1911, the contract was again extended by an agreement which required the appellee to take off the old cabin and build a new cabin, with the understanding that the appellee was still working under the May contract last above specified as to compensation; and that while no time was specified for its completion, the work was to be done at the earliest possible date.

The work upon the boat was completed in December, 1911, at a cost, according to the appellee, of $5,668.65. In the meantime the appellants had, on October 2, 1911, paid the appellee $500.00 upon account; but they having failed to pay any further sum, the appellee having theretofore filed a verified statement of lien in the county court clerk's office, filed this action on February 1, 1912, and levied a specific attachment upon the boat to secure its lien, under section 2482 of the Kentucky Statutes.

The appellants thereupon released the boat by executing the bond provided by section 2484 of the Kentucky Statutes.

Before answering, the appellants, by a special demurrer, raised the question of the jurisdiction of the Breckinridge Circuit Court to entertain this action. The objection to the jurisdiction was based upon the contention that the claim sued on, and the lien asserted by the appellee, were of exclusively admiralty cognizance, and that the jurisdiction in all such cases was in the admiralty courts of the United States, and not in the State courts. The plea to the jurisdiction was overruled; whereupon the defendants answered.

The answer and counterclaim is in six paragraphs. After denying the allegations of the petition and the items of the account sued on, and controverting appellee's right to a lien, the fourth paragraph of the answer alleged that the work done by appellee was done under the written contract of March 23, 1911, and not otherwise.

The fifth paragraph alleged that all the work charged for in the account sued on was contracted to be done and performed for the sum of $1,690.66, plus $200.00 for extra work, and that on October 2, 1911, appellants had paid appellee $500.00 by their check on the Owensboro Banking Company, which recited on its face that the payment of said $500.00 was for reconstructing the "R. D. Kendall" under the contract of March 23, 1911; and that having accepted said check the appellee was estopped to claim it had any other or additional contract with the appellants, or that appellants had ever agreed or promised to pay appellee any sum except as specifically stated in the written contract of March 23, 1911.

The sixth paragraph charged that appellee failed to comply with its contract of March 23, 1911; that there was no other contract between the parties, and that the work contracted to be done by appellee and all the work done by it was fully covered by that written contract.

By way of counterclaim, the answer further alleged that the boat as reconstructed was not seaworthy; that appellee did not construct the hurricane deck according to the contract, whereby appellants were damaged in the sum of $500.00; and that appellee further broke its contract by failing to complete the work within the time prescribed by the contract, whereby appellants had lost various items of business aggregating $3,234.51.

Upon the subject of the May contract, the reply said:

By an amended answer and counterclaim, appellants set out more in detail, and with greater particularity, the instances wherein appellee had broken and violated its contract, specifying the front stairway, the hull of the boat, the out-riggers, the caulking of the hull and the hurricane deck, as some of the instances in which the work had been imperfectly and unskillfully done.

The reply admitted the plaintiff entered into the written contract of March 23, 1911, but denies that all the that contract; and while admitting that the "R. D. Kendall" was delivered to the appellee under said written contract, to be remodeled and rebuilt according to the services rendered by the appellee were performed under terms thereof, the reply further alleged that the said written contract was subsequently abrogated, and that in lieu thereof an additional contract or contracts were entered into in May and August, 1911, as above indicated, for additional repairs.

"The plaintiff telephoned to the defendants, and the defendant J. T. Rounds came to Cloverport, Kentucky, and after looking over the boat and being told of the suggestions made by the said government inspectors, the said J. T. Rounds then and there abrogated the written contract filed with the petition and in lieu thereof made the following agreement, which agreement was acquiesced in by the plaintiff, to-wit: That all the work as specifically set forth in said written contract should be done, but in addition thereto all planking and all timbers were to be made anew in said boat; all deck timbers were to be made of new timber, and to relay all of the deck; that the plaintiff was to be paid therefor the actual cost of all labor and material furnished, plus ten per cent, and that said company, the plaintiff, was to keep strict account of all material and labor to be furnished, to be paid for when the boat was completed, and it was then conjectured that said boat could be completed under said contract about September, 1911."

In setting up the second supplemental contract of August, 1911, the reply further alleged that after appellee had nearly completed the hull of the boat under the May agreement, the appellants, upon having inspected the boat, suggested that the cabin should be made anew to correspond with the newness of the other parts of the boat, and thereupon ordered the appellee to build the

.cabin anew on the same terms and conditions as provided in the May contract, except as to the time of completion; that it was then conjectured that the said boat could be gotten ready for delivery in December, 1911, with the new cabin as above indicated; and that appellee then agreed to reconstruct the cabin anew under the terms of the May contract, as extended.

Appellants' demurrer to the reply was overruled. They insist, however, that the reply is an abandonment of the cause of action stated in the petition, in that it attempted to set up three distinct causes of action, no one of which, it is claimed, is even remotely mentioned in the petition; and that the court erred in giving a judgment under the pleadings.

For a reversal appellants rely upon three principal grounds: (1) That the State court had no jurisdiction because the demand sued on arose out of a maritime contract which could only have been enforced in the admiralty courts of the United States; (2) that no judgment could properly have been entered where the cause of action upon which it was entered, is stated only in the reply; and (3) that the judgment is against the weight of the evidence.

We will consider these questions in the order named.
1.  Sections 2480 to 2486, inclusive, of the Kentucky Statutes, giving a lien upon water-craft, read as follows:

"2480—Except the captain, all the officers and hands employed on board a steamboat or other brig, schooner, or sloop or model barge, shall have a lien on the boat or vessel, or engine, tackle, furnishing and apparel, for their wages, whether contracted for or earned in or out of the State, with priority therefor over any other debt due from the owner of the boat or vessel, and over all other liens thereon. Mechanics, tradesmen and others shall also have a like lien for work, supplies, materials, stores and provisions done or furnished on or toward the building, repairing, fitting, furnishing or equipping the boat or vessel in this State, with priority therefor over any other debt or debts of the owner, except to the officers and hands, and over all other liens thereafter created. When so done or furnished out of this State, there shall be a like lien therefor, which shall have precedence next after that given when done or furnished in this State; but if done or furnished out of the State, subsequent to

that done or furnished in this State, the liens shall be joint and equal.

"2481. A steamboat or other vessel in the last section named, and owner, shall also be liable to indemnify the party injured for any damage unlawfully done by her to any other boat, vessel or river craft, or to any other property, through the willful or negligent conduct of her officers or crew, and for any other damage willfully or negligently committed by her officers or crew while acting for her as such.

"2482. The lien given in section 2480, and the liability mentioned in section 2481 of this article, may be enforced by attachment from the court having jurisdiction.

"2483. Before issuing an attachment under this article, bond, with good surety, shall be given to the owners of the boat, by that designation, to indemnify for all damages and costs incurred thereby, if it shall appear that the attachment had been wrongfully obtained, on which suit may be brought and recovery had by any person injured by the attachment; but nothing herein shall vitiate a bond taken in any other mode.

"2484. The boat, vessel or other property attached under this article may be released upon the execution of bond, with good surety, to the plaintiff, in the penalty. to be named in the order for the attachment, conditioned to have the property attached forthcoming, if the court shall so order, or otherwise perform the decree of the court.

"2485. All persons having liens under this article against any boat or vessel may unite in a suit to enforce the same; and any person having a lien, who is not so united, may, by petition filed by leave of court, become a plaintiff in any suit pending to enforce a lien without the issuing of any other or additional process on said petition.

"2486. The liens given by this article shall not be enforced against a purchaser without actual notice thereof, unless suit be instituted within one year from the time the cause of action accrued, or unless notice thereof be indorsed on or attached to the enrollment of the boat or vessel."

As heretofore stated, this action was brought under the foregoing provisions of the statutes, although no specific statute is referred to, or relied upon, in the pe-

tition. The petition states the facts, however, which bring the case within the terms of the statute above quoted.

The statute, *supra*, does not pretend to give a maritime lien; it could only give a lien to non-maritime causes of action, or ordinary statutory liens.

We have, therefore, for decision, this question: Is the contract sued on and the lien enforced a maritime contract and lien? If they are, the State court was without jurisdiction.

In 26 Cyc., 751, a maritime contract is defined as follows:

"A maritime contract is one relating to a ship as an instrument of commerce or navigation when tending to facilitate its use as such, or in connection with its use as such. A maritime lien, however, does not arise out of every maritime contract. Many such contracts give only a personal right of action against the vessel owner or master, without giving the proprietary interest in the *res* which constitutes the maritime lien. In order for the lien to arise, the service must in some way be brought into relation with the ship itself and tend to facilitate her use as an instrument of commerce. For example, a contract of marine insurance, although maritime, gives no maritime lien; for it merely benefits the owner and does not benefit the vessel itself."

The same volume, on page 769, in speaking of the validity of local statutes giving a lien, says:

"When the cause of action is maritime by nature, although not vested with a lien under the general principles of admiralty law, a local statute can superadd a maritime lien, if the vessel against which it is asserted is within the range of State legislation; and such lien is enforceable in an admiralty court by a proceeding *in rem*. In other words a local statute can add to a cause of action essentially maritime a lien which it did not have before, as such legislation does not affect the general bounds of admiralty jurisdiction; and the federal court, finding a subject maritime by nature, will enforce it without inquiring into its origin, just as it would do in the case of a common law or equity cause of action created by a state statute. But a state statute cannot create a maritime lien as incident to a cause of action not maritime by nature, for in such case it would be in the power of the states to enlarge the general scope of the admiralty jurisdiction

recognized in the federal constitution. Hence a state cannot annex an admiralty lien to a contract for the original construction of a vessel, as that is not under the decisions, maritime by nature; and a state cannot change its nature. But as the power of the state in this regard is limited simply by the admiralty clause of the Federal Constitution, it follows that it is free to annex liens to non-maritime causes of action, such liens being ordinary statutory liens and not maritime liens. For this reason it can give a lien enforceable in its own courts on a contract for the building of a ship.''

And, again, on page 770 of the same volume, the author in speaking of local statutes which give common law remedies, further says:

''But although a state cannot confer on its courts jurisdiction over a proceeding *in rem,* it can give them jurisdiction over suits against the master or owners. And it can annex to such suit a process of attachment. The proceeding *in rem* which is forbidden to the state courts is a proceeding against the vessel by name as the real defendant in which the vessel itself is judged and sentenced. A proceeding against the owner is not made a proceeding *in rem* by the fact that it is accompanied by an attachment; for such an attachment is a mere incident to a personal suit, and a mere means of reaching the owner's interest; and in it only his title can be sold, and not a clear title to the property itself.''

This is not a new question in this court; on the contrary, the jurisdiction of the state courts in cases of this character has been repeatedly invoked, and sustained. The common law jurisdiction, with the common law remedies, are expressly saved to the state courts by the judiciary act of Congress of September 24, 1789; the judicial power of the United States extending only to cases of admiralty and maritime jurisdiction. This distinction is clearly pointed out in the decisions of this court.

Steamboat Hyatt and Owner v. Reitz & Haney, 4 Bush, 395, was a suit in equity against the owner of a steamboat for boilers furnished to the boat and repairs of its engine under a special contract made with the owner of the boat. Claiming a lien on the boat, the petition sought a judgment *in personam* and also *in rem.* In that case the contract was made at Evansville, Indiana; appellant's domicile was in Kentucky; and his boat

running on the Ohio River, was attached at Smithland, Kentucky, on that river.

In affirming the judgment of the circuit court which rendered a personal judgment against the owner and enforced the lien on his boat, this court said:

"The only question presented by this appeal is, whether the contract was technically maritime, and whether, therefore, the State or Federal court had jurisdiction to enforce it.

"Maritime contracts made on the sea or on any of its tributaries, not within the jurisdictional limits of any State, always operate *in rem;* and contracts for repairs or supplies of a ship or boat, at the instance of the master only, and not in its home port, are made, *ex necessitate,* on the credit of the vessel, and, therefore, imply a lien on it. But when the contract is made in the home port, or by the owner himself, there or elsewhere, it is presumptively made on his personal credit alone, and does not imply a lien on his vessel; and this latter class of contracts are not, in the constitutional sense, maritime, so as to give jurisdiction to the Federal courts, but all depend on the common law, and are remediable in State courts, according to the local laws, which guide and govern them. To sustain these positions, citations of authorities, which are abundant and uniform, would be unnecessary supererogation."

This doctrine has become so well established by the decisions of both the Federal and State courts, including the decisions of this court, that it is only necessary to refer to the cases.

See Stewart v. Harry, 3 Bush, 438; Marshall v. Curtis, 5 Bush, 607; Rake v. The Owners of the Steamboat Potomac, 6 Bush, 25; Digby v. Kenton Iron Co., 8 Bush, 166; U. S. Mail Line Co. v. McCracken, 17 Ky. L. R., 1111; Johnson v. Westerfield's Admr., 143 Ky., 15; Schoonmaker v. Gilmore, 102 U. S., 118; Iroquois Transportation Co. v. Delancy F. & I. Co., 205 U. S., 354.

We are, therefore, forced to the conclusion that the contract sued on in this action was not a maritime contract, and that the Breckinridge Circuit Court had jurisdiction of the action thereon, including the enforcement of the statutory lien.

2. In support of their contention that the judgment was improperly entered because, as it is claimed, the causes of action are stated only in the reply, appellants

rely upon sections 98 and 101 of the Civil Code, Spalding v. Alexander, 6 Bush, 160; Spiess' Admx. v. Bailey, 130 Ky., 279, and Stone v. Kelley, 143 Ky., 135.

The argument is, that since the Code requires the cause of action to be set forth in the petition, and section 98 of the Code provides that a reply may only contain (1) a traverse; (2) a statement of facts which constitute an estoppel against, or an avoidance of a set-off, counterclaim or defense stated in the answer; (3) a counterclaim against a set-off, and (4) a cross-petition, a new cause of action can only be set up in an amended petition; and that when it is set forth in the reply it constitutes a departure in the pleadings, which is prohibited by section 101 of the Code. The argument is sustained, in its general outline, by the authorities cited; they do not, however, fully cover the case we have before us. In the Spiess case the new cause of action was set up in the reply only, and no issue having been made by a rejoinder or otherwise, a default judgment was taken against the defendant. The opinion clearly shows that emphasis was laid upon the default feature of the judgment, and that it was reversed for that reason. In the Spalding case and in the Stone case, *supra,* the rule was applied in clear cases of departure; neither case was reversed, however, for an error in misapplying the rule, or at all.

The petition in this case declared upon a contract made "on the —— day of ————, 1911," by which appellants employed appellee to repair and rebuild the steamboat "R. D. Kendall" for the sum of $5,668.65, as shown by the itemized account filed with the petition, the sum claimed being the full amount claimed under the three employments of March 23rd, of May, and of August, 1911. The answer, having relied exclusively upon the contract of March 23rd, and denying that any work was done under any other or different contract, the reply set out specifically the full agreement as originally made on March 23rd, and as extended in May and in August, and under which the appellee claimed $5,668.65, as in the petition.

It should not be overlooked that the contract of March 23rd, provided for extra work, and that it should be paid for at the cost price, plus ten per cent for profit, and that the extended or new contracts of May and August were upon the same basis. Strictly speaking, therefore, it cannot be said that the reply sets out a new

or different cause of action; it is, in substance, merely an amplification and reiteration of the petition. And, while it would, perhaps, have been better pleading to present those matters in an amended petition, it clearly appears that appellants were not misled by the inadvertence of the pleader. The appellants controverted the reply and took elaborate proof upon the issue thus made; and although this was done only after appellants had exhausted their remedies in seeking to correct what they deemed an error of pleading, we refer to the fact in order to show the radical difference between this case and the Spiess case, *supra,* where the judgment went by default.

The purpose of all good pleading is to make plain the issues between the parties; and when that has been done, and the case has been tried upon the merits, the courts will be slow to reverse the judgment upon a technal view of the pleadings.

In Ruffner v. Ridley, 81 Ky., 171, we said:

"Counsel for appellant also insist that this court cannot consider the effect of the failure of title to the one acre of land on which the dwelling is situate, because it was first set up in the reply, whereas it should have been by amended petition. To this we say that both the court below and the parties treated the reply as an amendment to the petition, and acted upon it on the trial and in the decree as such, and we will therefore so treat it, as the rights of the parties have been fairly and fully considered under it."

Regardless of any error, therefore, that may have been committed by the pleader in this case, it is apparent that appellants were not prejudiced thereby; and that being true, there is no reversible error.

3. Is the judgment against the weight of the evidence?

Upon this issue the proof is radically contradictory. The testimony of the appellee's witnesses Weatherholt, Pate, McKaughan and May, tends to prove the contract as claimed by the appellee; and that all the labor and material shown by the itemized account filed, and aggregating 5,668.65, were supplied by the appellee in the rebuilding of the boat. Upon the question of the amount of labor and material furnished, and its cost and value, there is no testimony directly contradicting appellee's proof. Upon this subject appellants have confined them-

selves to the expert witnesses Wood and Landgrebe, who testified from an inspection of the boat some months after it had been finished. On the other hand, appellant Rounds is positive in his statement that the only contract appellants made was the original contract of March 23, 1911, and that plaintiff did no extra work beyond that called for by that contract, which aggregated about $1,900.00.

Furthermore, he says the hurricane roof was weak and unfit for use by large crowds, and that he never knew anything of the extra work that had been done upon the boat until about the time this suit was filed, in February, 1912. He admits, however, that he was in Cloverport on May 25th when he saw Pate and talked to him, and was there again on June 15th; and on both of these occasions he saw the boat under construction. Jesse was in Cloverport on August 29, 1911, and he also saw Pate and talked with him; and he was there again in June or in the early summer. Jesse was upon the boat and talked with Pate, Weatherholt, and Riddle the ship carpenter.

Without going into the details of the testimony upon the formation of the contract, it is sufficient to say that Pate, who testifies to the making of the new or extended contracts of May and August, is corroborated by Mc-Kaughan and May, and the further fact that both Rounds and Jesse visited the boat while the work was being done and made no objection whatever thereto.

When we consider that the original contract of March 23rd contemplated comparatively slight repairs when compared with the work subsequently done, it is difficult to believe that appellants could have understood that this new work which resulted in practically building a new boat, could have been embraced in the original contract of March 23rd. Yet Rounds is emphatic in his statement that he did not know before February, 1912, that any extra work beyond that contemplated by the contract of March 23rd had been done upon the boat. Nevertheless, the record shows that on November 10, 1911, the appellee wrote a letter to appellants enclosing an itemized statement showing that the work done on and material furnished to the boat, to that date, amounted to $3,945.17. The letter not only further requested appellants to carefully examine the statement of account and verify its correctness, but the appellee therein estimated

that the cost of the work upon the boat would probably be $5,000.00.

Rounds denied that he ever received the letter above referred to, although it was reproduced from the files of the appellants and filed in this case as a part of the deposition of Rounds. In view of this exceedingly lax memory upon the part of Rounds, we are not inclined to give very much weight to his recollection in other matters pertaining to this action.

In support of appellants' plea of estoppel an issue was made as to whether the check for $500.00 given by appellants to appellee on October 2, 1911, in part payment of the contract price, contained the recital that the $500.00 was paid "on contract of reconstructing the 'R. D. Kendall' March 23, 1911." Appellants insist that the check shows the contract was limited to the contract of March 23rd, and, therefore, supports their contention that they did not know anything about the extra work, which was not embraced in that contract. Appellee insists, however, that the recital above referred to was written on the face of the check after it had been paid and returned to the possession of appellants. We attach little importance, however, to the check, conceding that it was originally written as it now reads, since it is not a substantial contradiction of the contract as claimed by the appellee.

Furthermore, there is no merit in appellants' contention that they lost reasonably certain profits by appellee's failure to finish the boat before December 1, 1911. The alleged lost contracts would have been performed during the summer of 1911; and although the original contract of March 23rd contemplated that the boat should be finished by June 10th, the extended contracts of May and August necessarily postponed the date of completion. This fact is shown by the appellee, and evidently it was but a necessary change consequent upon the extended contracts.

From a careful reading of the testimony we have reached the conclusion that the weight of the evidence supports the finding of the chancellor.

If, however, we were in any doubt upon this subject, we think the judgment of the chancellor should be affirmed under the well recognized rule that where the proof is contradictory and the mind is left in doubt, the judgment of the chancellor will not be disturbed. By-

assee v. Evans, 143 Ky., 415; Kirkpatrick's Exor. v. Reh-
kopf, 144 Ky., 134; Wathen v. Wathen, 149 Ky., 505;
Bond v. Bond, 150 Ky., 392.

Finding no substantial error in the record, the judg-
ment is affirmed.